## MAYON v. JAHNCKE SERVICE, Inc., et al.
### No. 1782.

Court of Appeal of Louisiana. First Circuit.
Dec. 9, 1937.

Normann & Bethea and Harold M. Rouchell, all of New Orleans, for appellants.

Talbot, Menuet & Le Blanc, of Napoleonville, for appellee.

PELTIER, Judge ad hoc.

Plaintiff filed suit against the Jahncke Service, Inc., and its insurance carrier, Glen Falls Indemnity Company, alleging

his permanent and total disability as a result of an injury suffered in the course and scope of his employment, and seeks workmen's compensation at the rate of $14.60 per week from January 10, 1935, the date of his injury, not, however, beyond 400 weeks.

The defendants answered, admitting the injury to the plaintiff in the course and scope of his employment. They denied the rate of wages and terms of employment were as alleged by plaintiff, averring that the latter was an employee of defendants in a project operated under the provisions of the National Industrial Recovery Act, 48 Stat. 195. That the maximum hours permitted, and which controlled plaintiff's employment, were 30 per week at 40 cents per hour. That by consent of the federal government, under whose supervision the project had been undertaken, plaintiff and other laborers were working 7 consecutive days every two weeks beginning on Wednesday morning and ending Tuesday evening, and then "laying off" 7 days, making a weekly wage of $11.20, or $3.20 per day, 8 hours at 40 cents per hour, which resulted in employment of 3½ days per week, or $11.20 per week.

Defendants denied that plaintiff was totally or permanently disabled, and further averred that whatever it be, it was the result of his unreasonable refusal to submit to proper medical treatment; that had he so submitted to the offered treatment, the disability, if any, would have entirely ceased as of June 15, 1935; and that any subsequent disability was due to this unreasonable refusal. In the alternative, defendants averred that plaintiff's disability was only 25 per cent. of the loss of the normal use of his leg, and in any event his injury was restricted to the leg, and compensation should not be in excess of 175 weeks.

Plaintiff was injured on January 10, 1935, while working as a "swamper" for the Jahncke Service, Inc., in the parish of St. Martin. Plaintiff was cutting a log so as to remove it from the path of a skidder being operated in clearing the right of way for a spillway, when the log broke and struck the plaintiff's left leg causing a comminuted fracture of the left tibia just below the knee joint.

Plaintiff was taken to the Billeaudeaux Sanitarium under direction of the agents of the employer, and was there treated by Dr. Billeaudeaux, who put plaintiff's leg in a plaster cast on January 16th, at which time plaintiff was permitted to go home. However, he returned to the hospital for treatment on January 28th, when the cast was removed, and the knee baked and massaged. From the latter date up to August 22, 1935, Dr. Billeaudeaux gave the baking and massaging treatment to the knee, with active and passive motion, at periodic intervals; the chart showing some 35 of these treatments during this period. During all these treatments, plaintiff's leg did not improve, but got stiffer in the knee joint arising from ankylosis. Plaintiff could not bear his weight on the leg without pain; nor could he fully flex and extend the leg.

On March 13, 1935, during the time that plaintiff was under the treatment of Dr. Billeaudeaux, the insurance company, carrying the insurance for defendant, sent plaintiff to Dr. J. T. Scott, Sr., of New Orleans for examination and treatment, apparently without the knowledge or advice of Dr. Billeaudeaux who at that time was employed by the insurance company to treat the injured employees of the Jahncke Service, Inc. Dr. Scott had an X-ray made of plaintiff's knee and sent him to Mercy Hospital in New Orleans. Dr. Scott found the knee and left leg considerably swollen, and he recommended rest for the limb and hot applications followed by physiotherapy treatment. The plaintiff left the hospital before any treatment was given by Dr. Scott and returned home and continued his visits to Dr. Billeaudeaux for treatment. Plaintiff went to the Mercy Hospital on the afternoon of March 13th and left on the morning of March 15th. One of the defenses to the suit is the alleged refusal of plaintiff to remain in the hospital for treatment. This defense will be discussed later.

On two or three subsequent occasions in March, 1935, defendant's agents requested the plaintiff to return to New Orleans for treatment, which he refused to to do, assigning as a reason for his refusal that he was being treated by Dr. Billeaudeaux and this doctor told him not to return to the hospital without the doctor's instructions. It does not appear that the defendant made any further effort to induce plaintiff to accept further or additional medical treatment after March, 1935.

Plaintiff left for Morgan City after Dr. Billeaudeaux ceased treating him in August, 1935, and, under the instructions of

Dr. Billeaudeaux, plaintiff was treated by another doctor at Morgan City until December, when he went to New Orleans and was examined by Dr. Theodore Simon, an orthopedic surgeon, who found that plaintiff had a moderate hypertrophic arthritis of the left knee with some derangement of the knee joint, indicating an injury or displacement of the semilunar cartilage of the left knee. The doctor found plaintiff at that time to be totally disabled from doing manual labor.

In January, 1936, at the suggestion of Dr. Simon, plaintiff was operated on in the Charity Hospital by two of Dr. Simon's assistants, and this internal semilunar cartilage was removed. From the testimony of one of the doctors who performed this operation, it was successful in so far as the operation was concerned. Dr. Simon and the doctor who performed the operation saw plaintiff again in May, 1936, at which time they found that plaintiff could not actively fully flex and extend his knee, and that there was a marked atrophy of the muscles of his left thigh. Both doctors were of the opinion that on that date plaintiff was totally disabled from performing manual labor.

Plaintiff was examined in December, 1935, just prior to the operation above mentioned, by Drs. E. S. Hatch and J. T. Scott, Jr. They found the left knee seven-eighths of an inch larger in circumference than the right knee; that plaintiff could not fully flex and extend his knee; nor could he put his weight on it without pain. They fixed his disability at that time at 25 per cent. of the loss of the use of the left leg. These two doctors were called by the defendants. Dr. Scott did not recommend any treatment at that time, and the only treatment recommended by Dr. Hatch was physiotherapy treatment; neither recommended the removal of the internal semilunar cartilage of the knee.

The plaintiff says that he has not been able to do manual labor since the injury. From the evidence of plaintiff as well as that of the doctors, there is no question but that he was unable to perform manual labor up to the time of the trial of the case.

The principal defense is that plaintiff refused reasonable medical treatment, and that, whatever may be his present disability, it is due to his own unreasonable refusal to avail himself of the medical treatment tendered him by defendant. It is therefore necessary to determine, first, whether or not plaintiff did arbitrarily and unreasonably refuse medical treatment tendered him by the employer; and, second, if he did so, would that treatment have been sufficiently effective to insure against the continuance of the disability? We think defendants have failed to prove either proposition. Plaintiff is an illiterate, partly deaf, and rather simple laborer, unable to speak or fully understand the English language. He was dependent on others for advice as to what to do in getting relief from his injury. He evidently did everything that Dr. Billeaudeaux told him to do, and submitted to treatment by this doctor for several months. He had been sent to Dr. Billeaudeaux by the employer and had a right to rely on his instructions and treatment. The fact that the insurance company subsequently discontinued the services of this doctor is no concern of plaintiff. It may be noted that frequently illiterate country people have more confidence in their country family physician than in physicians and surgeons enjoying national reputations, and we are of the opinion that the plaintiff was justified in relying upon the advice of his own family physician; at least, he should not be penalized for relying on his opinion and advice.

When the insurance company sent plaintiff to New Orleans in March, 1935, he was being treated by the insurance company's doctor. The plaintiff says that Doctor Scott, Sr., did not tell him that he would have to stay in the hospital for a considerable time; that this doctor told him he could go back in a few days, as he only had a fracture and it had healed. Plaintiff further says that Dr. Scott sent him to the hospital late one afternoon, and told him that he (the doctor) would be over to see him the next morning; that the doctor did not come all the next day, and on the following morning plaintiff tried to get the nurses at the hospital to call Dr. Scott, which they refused to do; that he was out of money, and his son, who had been sent with him, was out of money, and had no place to stay and no way to get home. He and his son then left the hospital, called at the office of Jahncke in New Orleans, and secured sufficient money to get back home. He continued

the treatments under Dr. Billeaudeaux, and when he was requested by defendant's agents a few days later to return to the hospital, according to his uncontradicted statement, Dr. Billeaudeaux told him not to return unless he (the doctor) went with him.

Considering the fact that plaintiff was in a strange environment, with no funds for himself or his son who had been sent along with him, coupled with the fact that he could not, or at least did not, understand why Dr. Scott did not come to see him the next morning as plaintiff understood the doctor was to do, we do not think this action on the part of plaintiff constitutes an arbitrary or unreasonable refusal to stay in this hospital for treatment. Nor was his refusal to return unreasonable in view of the fact that he thought the doctor who was then treating him did not want him to return unless instructed to do so by the doctor.

Moreover, defendants have not shown that had plaintiff stayed in the Mercy Hospital, he would have been treated any better than the treatment that was given him by Doctors Billeaudeaux, Gueymard, Simon, and Farrington. We are not justified in saying that Dr. Scott, Sr., would have been more successful in his treatment in March, 1935, than was Dr. Billeaudeaux, up to August of that year, nor the later treatment given by Doctors Gueymard, Simon, and Farrington. To hold otherwise would be largely a matter of speculation.

In all of the cases barring a recovery for further compensation on account of a refusal to submit to medical treatment, the refusal was willful and unreasonable. In this case the question is rather one of who should do the treating, rather than one of accepting treatment. In fact, plaintiff in this case was treated by several different doctors, and, without saying that these doctors were incompetent, it will not do to say now that the treatment should have been by other doctors or by other methods.

Dr. Billeaudeaux, who treated plaintiff longer than any other physician, thinks the disability is likely to be permanent. The other doctors think plaintiff's disability would disappear with proper treatment after a few months. According to plaintiff's testimony, the doctors who treated him last discharged him for the reason that further treatment would be useless. According to Dr. Simon, the kind of treatment necessary to rehabilitate plaintiff and restore the full use of his leg is of a highly specialized kind, very expensive, and could not be given in the country. In view of the rather uncertain and doubtful prospect of plaintiff being able to secure such treatment as will restore the full use of his leg, and in further view of the fact that the time necessary for the rehabilitation is somewhat indefinite, we think the judgment awarding compensation for total permanent disability for a period not exceeding 400 weeks is correct. In the case of Schneider v. Travelers Ins. Co. (La.App.) 172 So. 580, it was held: "Where disability is total, but evidence does not disclose definitely whether it is permanent or temporary, appropriate compensation should be allowed during disability, but not beyond 400 weeks (Act No. 20 of 1914, § 8, subsec. 1(b), as amended by Act No. 242 of 1928, p. 357)."

Defendants will be able to protect themselves if plaintiff recovers before the expiration of the full period by making timely application for the amendment of the judgment, and we, therefore, are of the opinion that the plaintiff should be awarded compensation, during disability, for a period not exceeding 400 weeks.

Plaintiff was working on a federal project on which the National Industrial Recovery Act (48 Stat. 195) applied as to labor. Plaintiff's wages were based on a maximum week of not over 30 hours with a maximum wage of 40 cents per hour. As a matter of practice, and with the consent of the government engineers, he actually worked 30 hours during the latter part of one week and 24 hours for three days the first of the following week; that is for a total of 54 hours for the two weeks' period. The basis of his employment, however, was a 30-hour week with a wage of 40 cents per hour, regardless of the number of hours actually worked. As was said of the employee in the recent case of Barr v. United Gas Public Service Co. et al., 183 La. 873, 165 So. 129, 130, "Regardless of how many days in each week decedent [the employee] may have worked, his compensation was definitely fixed under the Code at the maximum of 40 cents an hour for a maximum of 40 hours a week, or at a wage not to exceed $16 per week." In our opinion, this case is controlled by the cited case, and the trial judge correctly

fixed the weekly wage on the basis of a 30-hour week and 40-cent per hour wage.

For the reasons assigned, the judgment appealed from is affirmed.

LE BLANC, J., not participating.